IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,           )
                                )
v.                              )
                                )       No. 3:19-CR-123-RLJ-HBG
JUSTIN DARRELL COZART,          )
                                )
            Defendants.          )

**REPORT AND RECOMMENDATION**

This case is before the Court, for report and recommendation, on the Defendant Justin

Cozart's Motion to Suppress [Doc. 36-1]. *See* 28 U.S.C. § 636(b). On May 24, 2019, Loudon

County Sheriff's Deputy Charlie Huskin was dispatched to arrest Elizabeth Kress, who had an

outstanding capias, after law enforcement received a tip that she was at a residence on Dry Valley

Road in Loudon, Tennessee. As Deputy Huskin walked up the driveway of the residence, he saw

a white Sport Utility Vehicle ("SUV") with two occupants: Defendant Cozart, who was reclined

in the driver's seat, and Ms. Kress in the front passenger seat. Defendant's arm was resting on a

long gun inside a soft zippered case, which was lying on the center console. Deputy Huskin

directed the occupants out of the car and arrested Ms. Kress. Loudon County Sheriff's Investigator

Marty Stanley arrived on the scene and saw two guns through the SUV's windows. Investigator

Stanley arrested Defendant Cozart based on his knowledge of Defendant's prior felony conviction.

Law enforcement then searched the SUV and seized the two guns. Defendant argues that law

enforcement violated his rights under the Fourth Amendment by entering curtilage of the property

and searching the SUV, both without a search warrant.

For the reasons discussed herein, the Court finds law enforcement's entry onto the property and the search of the SUV comport with the Fourth Amendment. Thus, the undersigned respectfully recommends that Defendant's Motion to Suppress be denied.

## I.     POSTIONS OF THE PARTIES

This case arises out of the May 24, 2019 search of an SUV, in which Defendant had been sleeping. Based upon evidence seized from the SUV on that day, Defendant is charged with a single count of being a felon in possession of firearms [Doc. 1].

The Defendant asks [Docs. 36-1 & 43] the Court to suppress all evidence gained from law enforcement's warrantless entry onto the curtilage of the residence on Dry Valley Road and warrantless search of the SUV. He argues that officers violated the Fourth Amendment when they left the roadway and entered private property without a search warrant. Defendant maintains that the capias for Ms. Kress did not permit the officer's entry onto the property. He also asserts that the tip of a confidential informant did not provide probable cause or reasonable suspicion that Elizabeth Kress was on the property. Finally, Defendant contends that the automobile exception to the warrant requirement does not apply to the search of the SUV on private property and the officers were not lawfully on the property, so the plain view exception also does not apply.

The Government responds [Doc. 42] that law enforcement lawfully walked up the driveway to conduct a "knock and talk," inquiring about a person with an active arrest warrant. It contends that the guns inside the SUV were in plain view as officers executed the arrest warrant for the passenger of the SUV. The Government argues that the officers properly searched the SUV pursuant to the automobile exception to the warrant requirement. It maintains that at the time of the search, the officers had probable cause to believe that evidence of a crime was inside the SUV.

2

The Court held an evidentiary hearing on the suppression motion on June 29, 2021. Assistant United States Attorney LaToyia T. Carpenter appeared on behalf of the Government. Attorney Russell T. Greene represented Defendant Cozart, who was also present. Following the presentation of evidence and argument, defense counsel asked to file a post-hearing brief. Because defense counsel was starting a lengthy federal trial in early July, the Court set a deadline for post-hearing briefs of September 13, 2021, the date requested by defense counsel. No additional briefs were filed in this case, and the Court took the suppression motion under advisement.[1]

## II.     SUMMARY OF TESTIMONY

The Government presented the testimony of Investigator Charles Edward Huskin and Investigator Marty Stanley, both with the Loudon County Sheriff's Office ("LCSO").

Investigator Huskin testified that he has been an investigator for the LCSO since November 17, 2020, and before that he was a patrol officer for four years. Before going on patrol, Investigator Huskin worked as a corrections officer at the jail in Loudon County for five years. Investigator Huskin stated that in May 2019, he was directed by a narcotics officer to find Elizabeth Kress, who was believed to be at a residence located at 7900 Dry Valley Road in Loudon, Tennessee. The residence was located in a wooded area and had a long driveway. Investigator Huskin estimated that the driveway was eighty to one hundred yards long, and the house was located on the right side of the driveway. Upon arriving at the residence, Investigator Huskin saw Defendant Cozart and Ms. Kress in a white Ford Explorer.

---

[1] At a hearing on October 18, 2021, and again in early January 2022, defense counsel informed the Court that Defendant anticipated entering into a plea agreement and was not seeking a ruling on his suppression motion. However, the motion to suppress was not withdrawn, and defense counsel subsequently conveyed that Defendant wanted a ruling on his suppression motion and to proceed to trial.

3

Investigator Huskin said he noticed "head movement" in the Explorer, walked to the driver's side, and spoke with Defendant Cozart, who was in the driver's seat. He saw Ms. Kress, the woman for whom he was looking, in the passenger seat. Investigator Huskin had both occupants get out of the Explorer. He testified that Ms. Kress had an active arrest warrant, and he planned to take her into custody. He said that he asked Defendant Cozart to step out of the car for officer safety, because he was the only officer on the scene at that time. Investigator Huskin stated that other officers were in route to the residence, so he waited for back up to arrive.

Investigator Huskin said he was wearing a body camera that day, and he identified the video footage from his encounter with Defendant and Ms. Kress [Exh. 2]. Investigator Huskin reviewed the video, stating that he asked Defendant to get out of the car because Defendant's elbow was resting on a firearm. He agreed that less than ten minutes after he first encountered Defendant Cozart in the car, narcotics Investigator Mark Stanley arrived on the scene. Investigator Huskin said he and Investigator Stanley discussed that an individual named Chris Darnell was staying at or renting the residence, which was owned by the Loudon County District Attorney.

The video recording [Exh. 2] shows that Investigator Huskin arrived at the house and parked in the driveway, even with the front of the residence. The front door of the residence was accessible by stairs that began at the driveway and led up to a porch. A white Ford explorer was parked at the top of the driveway, even with the back of the house. Investigator Huskin walked up to the open driver's side window and encountered Defendant partially reclined in the driver's seat and Ms. Kress sitting in the front passenger seat. A gun case was on the center console. Investigator Huskin asked the female passenger if she was Elizabeth Kress. When she responded "yes," he asked her to get out of the car because he needed to talk to her. Investigator Huskin asked Defendant to get out of the car, so Investigator Huskin could keep an eye on him. Defendant

4

exited the SUV with his dog and began walking his dog, which was on a leash, in the tree line along the side of the driveway.

The video recording [Exh. 2] shows that Investigator Huskin had Ms. Kress stand by the front of his patrol car. Investigator Huskin radioed that he had Ms. Kress and asked about "the other one." Another officer replied that Ms. Kress is the only one "we have paper for." Investigator Huskin told Ms. Kress that they had a "paper" for her and "if it's a good warrant," she was going to jail. Ms. Kress stated that she had been out of jail for two days. In response to questioning by Investigator Huskin, Ms. Kress said that the house belongs to Chris Darnell, who just left to go to work, and that no one is inside. During this conversation, Defendant walked his dog across the driveway and toward the front of the house, then into the wooded area at the top of the driveway beyond the SUV.

The video recording [Exh. 2] reveals that approximately four minutes after Investigator Huskin arrived, Corporal Brian Smith arrived and parked behind Investigator Huskin's patrol car. Investigator Huskin told Corporal Smith to keep an eye on Defendant, because Huskin feared the Defendant would throw something into the woods. Ms. Kress told Investigator Huskin that she had been with Defendant since she got out of jail but wanted her best friend to pick her up. After discussing that Ms. Kress was in jail for theft, Investigator Huskin asked her if Defendant was her boyfriend. Ms. Kress said that Defendant was not her boyfriend but agreed he would like to be her boyfriend. Around seven minutes after arriving at the residence, Investigator Huskin put Ms. Kress in the back of his patrol car. One minute later, Investigator Mark Stanley arrived on the scene and parked in the driveway behind Corporal Smith's patrol car.

The video recording [Exh. 2] shows that Investigator Huskin walked down the driveway to meet Investigator Stanley. Investigator Huskin told Investigator Stanley that Ms. Kress was in

5

custody, the residence belonged to Chris Darnell, and that Mr. Darnell had gone to work. Investigator Huskin asked whether the officers would be searching the house. Investigator Stanley replied they would not search it unless Investigator Huskin had seen something in plain view. Investigator Huskin denied seeing anything or looking in the SUV thoroughly. He told Investigator Stanley that while he was talking with Ms. Kress, Defendant had been walking his dog and that Huskin was concerned that Defendant could have disposed of contraband. Investigator Huskin said Corporal Smith was waiting with Defendant. Investigator Huskin told Investigator Stanley that he had not searched the car, that he found Defendant in the driver's seat and Ms. Kress in the passenger seat, and that they were not asleep when he first spoke to them. Investigator Stanley directed Investigator Huskin to ask Defendant for consent to search the car.

The video recording [Exh. 2] reveals that Investigator Huskin asked Defendant if the officers could search the car, to which Defendant responded that the SUV was not his car. When Investigator Huskin asked to whom the car belonged, Defendant pointed in the direction of Ms. Kress, who was seated in Investigator Huskin's patrol car. Investigator Stanley, who was standing beside the SUV, asked Defendant about the gun in the car. Defendant replied that there are two guns in the car. Investigator Stanley asked Defendant, "Ain't you a felon?"[2]

The video recording [Exh. 2] shows that Investigator Huskin returned to his patrol car and asked Ms. Kress if the SUV was her car. Ms. Kress said the SUV was not her car, it belonged to Ashley Curr, and Defendant was driving it. Investigator Huskin asked Ms. Kress if the guns belong to Defendant, and she responded that she did not know to whom the guns belonged. Investigator Huskin told Ms. Kress that the officers were going to search the SUV. Investigator Huskin then

---

[2] Defendant's response is not audible because Investigator Huskin returned to his patrol car to talk with Ms. Kress.

told Investigator Stanley that the car belongs to Ashley Curr but that Defendant was in the driver's seat when he arrived. Defendant told the officers that the guns in the car belong to his cousin. When Investigator Huskin stated that as a felon, Defendant is not supposed to be within reaching distance of a gun, Defendant replied that he did not realize the guns were in the car. Defendant said he was waiting on Chris and fell asleep.

Investigator Huskin testified that he went to the residence to conduct a "knock and talk." He explained that in a knock and talk, he would knock on the door to the residence and ask if Elizabeth Kress was there. If the person answering the door told him that she was not there, he would ask if he could come inside. If the person answering the door denied entrance, he would have returned to his car and left. Investigator Huskin said he was surprised to find Ms. Kress in the driveway of the residence. Investigator Huskin stated he was familiar with Defendant Cozart because Defendant had been in the Loudon County Jail on drug charges, while Huskin worked there. He said Defendant had been in jail for most of the five-year period that he was a corrections officer, and he knew Defendant was possibly a convicted felon.

Investigator Huskin testified that while he and Investigator Stanley were talking with Defendant, Defendant said the Explorer was not his car. Investigator Stanley noted Defendant was a felon and asked about the guns in the car. Investigator Huskin said Defendant acknowledged there were two guns in the vehicle.

On cross-examination, Investigator Huskin stated he was familiar with the road and vicinity of the residence but was not familiar with the residence. He said Lieutenant Shane Ezell, who worked in narcotics, advised him to go to the residence and try to find Ms. Kress. Investigator Huskin said Lieutenant Ezell did not tell him who lived at the residence, nor did he know who owned the residence. He said he talked to Lieutenant Ezell, while he was on patrol, so he thought

7

they spoke by phone. Lieutenant Ezell told him that Ms. Kress was charged in an indictment and that most of the defendants with indictments were taken into custody the previous day, but she was not. Investigator Huskins said Lieutenant Ezell told him to try to pick up Ms. Kress. He said Lieutenant Ezell did not give him an arrest warrant or tell him why Ezell thought Ms. Kress would be at the residence.

Investigator Huskin identified a Capias/Bench Warrant [Exh. 3] for Elizabeth Kress but said he did not see the capias until after Ms. Kress was in custody. Investigator Huskin agreed that the capias was signed by the clerk of the Loudon County Circuit Court. He said he saw the capias for Ms. Kress later when he took her to the jail. Investigator Huskin was not aware of an arrest warrant for Ms. Kress. He said either Investigator Stanley or Lieutenant Ezell told him there was a capias for Ms. Kress. He said Investigator Stanley, not Lieutenant Ezell, called him and told him to pick up Elizabeth Kress at the residence, because she was charged in an indictment but had not been arrested the day before. He said Investigator Stanley did not say Ms. Kress lived at the residence. Investigator Huskin said once he had Ms. Kress in custody, he radioed Lieutenant Ezell to confirm that Ms. Kress was on the premises.

Investigator Huskin said on the scene, one of the officers asked if the house would be searched, but the answer was, "no." Investigator Huskin stated that he did not talk to Chris Darnell. He agreed that the Explorer was parked in a parking area on the driveway next to the house. He agreed that he was on the curtilage of the residence when he encountered Defendant. Investigator Huskin said he did not ask Defendant if he lived at the residence. He did not recall Defendant saying he stated there frequently.

On redirect examination, Investigator Huskin testified that he was told about the capias for Ms. Kress before he went to the residence, but he did not have the capias with him. He agreed that

8

Investigator Stanley advised him of the capias. He said he saw the capias later when he transported Ms. Kress to the jail. He testified that a capias is the same thing as an arrest warrant. He agreed that he can arrest someone on a capias just like he can arrest someone on an arrest warrant. He agreed that it is common for other officers to know details about a case that he does not know.

Investigator Marty Stanley testified that he is a narcotics investigator for the LCSO and has held that position for over ten years. He said he has eighteen years of experience in law enforcement, and before becoming an investigator, he worked as a corrections officer, a patrol officer, and a school resource officer for LCSO. He stated that in the year preceding the arrest of Ms. Kress, he was involved in a narcotics investigation in Loudon County. He said law enforcement conducted controlled purchases, executed search warrants, and made traffic stops as a part of this investigation. The investigation led to indictments for more than seventy people. Investigator Stanley said on May 23, 2019, law enforcement officers from LCSO and other agencies conducted a large "roundup" of indicted defendants. He identified the indictment [Exh. 4] for Ms. Kress, charging the sale of methamphetamine. He agreed that the indictment charges the same person named on the capias [Exh. 3], Elizabeth Kress.

Investigator Stanley said on May 24, 2019, he received information from a confidential informant that Ms. Kress was at 7900 Dry Valley Road. Knowing there was a capias for Ms. Kress, Investigator Stanley drove to 7900 Dry Valley Road. Investigator Stanley called Investigator Huskin, who was closer to the residence. When Investigator Stanley arrived, Investigator Huskin and Corporal Brian Smith were already on the scene. Investigator Huskin had Ms. Kress in custody and had put her in the back of his patrol car. Investigator Stanley said Investigator Huskin asked him about searching the house. He said he told Investigator Huskin they would not search it unless Investigator Huskin had seen something in plain view.

9

Investigator Stanley said Investigator Huskin asked Defendant, who was standing outside the Explorer, if they could search the car, to which Defendant replied it was not his car. Investigator Stanley said he walked by the driver's side window and saw a firearm lying on the center console in plain view. Investigator Stanley identified a photograph [Exh. 5] taken from the passenger side of the car and pointed to the firearm. Investigator Stanley said he asked Defendant about the firearm and asked, "Aren't you a felon?" He said Defendant told him there was a second firearm in the car. Investigator Stanley said he took a couple of steps back, and through the window, he saw a .22 rifle in the backseat. Investigator Stanley stated he knew Defendant had previously gone to prison for felony offenses and that he was a convicted felon. He said he had encountered Defendant several times before that day, including when he worked in the jail. Investigator Stanley said he detained Defendant Cozart based on probable cause that he was a felon in possession of firearms, searched the Explorer, and seized the two firearms.

Investigator Stanley testified about the process for arresting individuals named in an indictment. He stated that once the grand jury issues an indictment, the clerk of court issues a capias for the person charged in the indictment. He said a capias is an arrest warrant issued by the criminal court. Investigator Stanley said the capias for Ms. Kress [Exh. 3] is signed by the Loudon County Circuit Court Clerk Steve Harrelson. He stated that as indicated on the face of this capias, a capias can be signed by a judge, the clerk, or a deputy clerk on behalf of the clerk. He said there are no magistrates in the criminal court system in Loudon County, nor is he aware that a magistrate can sign a capias. The Government entered copies of Tennessee Rules of Criminal Procedure 4 and 9 as Exhibit 7.

Investigator Stanley said an agent from the Ninth Judicial Task Force reported a call from a confidential informant, who said Ms. Kress was at a rental property owned by the district

attorney. The informant knew there was an arrest warrant for Ms. Kress because the informant had made purchases of illegal drugs from her. Investigator Stanley said the informant had proven to be reliable. He said law enforcement had dealt with that informant many times and had obtained multiple search warrants and arrests, some in federal cases, based on the information from that informant. He said the informant reported that Ms. Kress was at the residence at that time. As he was leaving his office, Investigator Stanley called Investigator Huskin, who was on patrol in the area of the residence.

On cross-examination, Investigator Stanley testified that he heard Investigator Huskin testify that Lieutenant Shane Ezell called him and then change his testimony to say that he (Stanley) had called him (Huskin). Investigator Stanley said he was the one who called Investigator Huskin, rather than Lieutenant Ezell, because he knew Investigator Huskin was on patrol in the area of the residence. He said he and Lieutenant Ezell work in the same unit and both of them are constantly making phone calls.

Investigator Stanley testified that a capias bench warrant is basically an arrest warrant. He said his understanding is that a capias is like an arrest warrant and is issued for an arrestable offense. Investigator Stanley said in cases like that of Ms. Kress, the officers take the person to jail, rather than directly to court, and they come before the court at the court's convenience. He said he had not heard of a "NIA," meaning "not in attendance" or "not in arrest," capias. Investigator Stanley said the capias for Ms. Kress had a $15,000 bond. He said when he received the capias, a bond had not been made on this case, because it was a "new bill indictment." Investigator Stanley said on a new bill indictment with a criminal court capias, an officer takes the defendant to jail upon arrest, then the criminal court arranges for the defendant to come before a judge for an initial appearance, and any motions for or hearings on bond are heard at that time. He

11

said he thought the criminal court was in session at the time of Ms. Kress's arrest, but he did not know when she appeared before a judge. Investigator Stanley reiterated that a capias is an arrest warrant issued by the criminal court. He agreed that grand jury proceedings are secret and said that a capias is not posted publicly.

Investigator Stanley stated that Investigator Huskin had been on the scene for less than ten minutes before he arrived. He said when he walked by the car and looked inside, he saw a shotgun. He said that the gun case was unzipped at the time he saw it, but no one had been inside the car, after Defendant and Ms. Kress got out.

Investigator Stanley testified that a group of officers was completing paperwork in the office, when an agent received a call from a confidential informant, who said that Ms. Kress was at the residence. He said he knew of that residence, because it was owned by District Attorney Russell Johnson. He had not been to the residence before. Upon arriving at the residence, Investigator Huskin and Corporal Smith told him who rented it. He believed they got that information from Ms. Kress. Investigator Stanley said he spoke with Defendant Cozart briefly while Defendant was standing beside the car. He did not remember Defendant saying that he stayed at the residence often.

Investigator Stanley did not know the exact number of times the confidential informant had worked for law enforcement before May 24, 2019. He said the confidential informant had made several controlled buys of illegal narcotics on behalf of the police. Investigator Stanley said law enforcement obtained search warrants and federal prosecutions based on those controlled buys. Investigator Stanley said most confidential informants are paid but denied that the confidential informant was a government employee. He did not know how much this confidential informant was paid. He said the amount of pay varies from case to case.

12

## III.    FINDINGS OF FACT

Based upon the testimony of Investigators Huskin and Stanley and the exhibits, the Court makes the following factual findings:

In May 2019, officers with the LCSO were wrapping up a year-long investigation into narcotics trafficking in Loudon County.  The grand jury returned indictments for over seventy individuals in connection with this investigation, including an indictment for Elizabeth Kress. Following the return of the indictment for Ms. Kress on May 20, 2019, the clerk of court issued a Capias/Bench Warrant for Ms. Kress on May 21, 2019.  While working in the office on May 24, 2019, a task force officer received a call from a confidential informant that Ms. Kress was currently at a residence at 7900 Dry Valley Road.  The task force officer told Investigator Marty Stanley about the call.  Investigator Stanley called Deputy[3] Charles Huskin, who was on patrol in the area of the residence, told him there was a capias for Ms. Kress, and directed Deputy Huskin to go to the residence and arrest Ms. Kress.  Investigator Stanley then left his office and drove to the residence.

Deputy Huskin drove to the residence and parked behind a white Ford Explorer, which was parked at the top of the driveway.  Deputy Huskin saw the SUV contained two occupants.  Deputy Huskin walked up to the open window on the driver's side, recognized Defendant Justin Cozart in the driver's seat, and identified Ms. Kress in the passenger seat.  Deputy Huskin could see that Defendant's arm was resting on a long gun in a soft gun case, which was on top of the center console.  Deputy Huskin asked both Defendant and Ms. Kress to get out of the car.  While Deputy

_____

[3] On May 24, 2019, Investigator Huskin was a patrol deputy at the LCSO.

13

Huskin talked with Ms. Kress at the front of his patrol car, Defendant walked his dog in the tree line by the driveway.

Deputy Huskin handcuffed Ms. Kress and told her there was a warrant for her arrest. Pursuant to questions from Deputy Huskin, Ms. Kress said Chris Darnell lived at the residence. Corporal Brian Smith arrived on the scene four minutes after Deputy Huskin. Deputy Huskin asked Corporal Smith to watch Defendant, who was still walking his dog but had moved to the area in front of the SUV. Ms. Kress told Deputy Huskin that no one was inside the residence, because Chris Darnell had just left for work. She said Defendant was not her boyfriend, but she had been with him for the past two days, after she got out of jail. About seven minutes after his arrival, Deputy Huskin put Ms. Kress in the back of his patrol car.

Investigator Stanley arrived at 7900 Dry Valley Road around eight minutes after Deputy Huskin. Deputy Huskin told Investigator Stanley that when he arrived, he found Defendant in the driver's seat and Ms. Kress in the passenger seat of the SUV. Deputy Huskin said he had not searched the car. Investigator Stanley directed Deputy Huskin to ask Defendant for consent to search the car. When asked for consent, Defendant denied that the SUV was his car and indicated that it was Ms. Kress's vehicle. Investigator Stanley walked up to the SUV, saw a shotgun inside an open case on the console of the car, and asked Defendant about the gun. Defendant responded that there were two guns in the car. After learning of the second gun, Investigator Stanley stepped back and saw the second gun, a .22 rifle, in the backseat through the SUV's window. Investigator Stanley asked Defendant, "Ain't you a felon?" Deputy Huskin returned to Ms. Kress, who told him the SUV belonged to Ashley Curr, but Defendant was driving it. She said she did not know to whom the guns belonged. Upon hearing Deputy Huskin relay the information on the car's

owner to Investigator Stanley, Defendant said the guns belonged to his cousin and denied knowing they were in the car. Defendant said he fell asleep in the car while waiting on Chris to return.

Officers searched the SUV and seized two guns. Defendant was arrested for being a felon in possession of firearms.

## IV.     ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Defendant Cozart argues that law enforcement violated his rights under the Fourth Amendment by entering onto the curtilage of 7900 Dry Valley Road and by searching the Explorer, both without a search warrant. The Court examines each of these issues in turn.

### A. Warrantless Entry onto 7900 Dry Valley Road

Defendant Cozart contends that law enforcement violated his rights under the Fourth Amendment by entering the property at 7900 Dry Valley Road without a search warrant. He contends that the capias for Ms. Kress did not authorize law enforcement's entry onto the property, because a capias is not an arrest warrant. Finally, he asserts that even if the capias authorized the officers to take Ms. Kress into custody, they lacked probable cause to believe she would be at that residence. The Government responds that officers could properly enter onto the property to arrest Ms. Kress. The Court examines these issues, after first exploring whether Defendant Cozart has a legitimate expectation of privacy in 7900 Dry Valley Road, such that he may challenge the officers' warrantless entry onto the property.

*(1) Propriety of Challenge*

As an initial matter, the Court questions whether Defendant Cozart enjoys a legitimate expectation of privacy in 7900 Dry Valley Road that would enable him to challenge the officers' entry onto the property. *See United States v. Ellis*, 125 F. App'x 691, 695 (6th Cir. 2005) (holding that the court must examine a party's right to challenge a search even when the issue is not raised by the parties). Fourth Amendment rights are personal rights, i.e., they protect a person rather than a particular place. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998); *United States v. Pruitt*, 458 F.3d 477, 485 (2006) (J. Clay, dissenting) (observing that defendant "can assert only his own Fourth Amendment rights, and not the Fourth Amendment rights of . . . the third-party homeowner . . . whose home the police entered without a valid search warrant in order to effectuate" defendant's arrest). To contest whether a search comports with the Fourth Amendment, the defendant must have "a reasonable expectation of privacy" in the location searched. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001). Here, Defendant Cozart was neither the owner or renter of the residence, nor the subject of the capias.[4] The determination of whether he had a legitimate expectation of privacy in the property is a critical threshold question in this case.

---

[4] As discussed later, a valid arrest warrant authorizes law enforcement to enter and arrest a person in his or her own home. *Payton v. New York*, 445 U.S. 573, 603 (1980). However, a search warrant for the premises is required to search the residence *or seize evidence in plain view*, when the homeowner is not the subject of the arrest warrant. *Steagald v. United States*, 451 U.S. 204, 216-17 (1981). "Therefore, a homeowner may experience a Fourth Amendment injury when the police enter his or her home without a valid premises search warrant (and in the absence of consent or exigent circumstances) in order to effectuate an arrest of a homeowner's guest, even when the police possess a valid arrest warrant for the arrestee." *Pruitt*, 458 F.3d at 486 (J. Clay, dissenting) (citing *Steagald*, 451 U.S. at 217). In the instant case, Defendant Cozart is neither the homeowner, nor the guest arrestee, although in challenging the entry onto the premises and the validity of the capias, he purports to assert the Fourth Amendment rights of both the homeowner and Ms. Kress.

16

A defendant challenging a search has the burden of demonstrating his or her legitimate expectation of privacy in the location. *Id.* In assessing the reasonableness of a defendant's expectation of privacy, the Court examines

> "the person's proprietary or possessory interest in the place to be searched or item to be seized[;] whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises."

*United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) (quoting *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000)).

Defendant contends that he was an overnight guest at the residence and that he stays there regularly [Doc. 43, p.2]. An overnight social guest "has a reasonable expectation of privacy in the place where he sleeps at night." *United States v. Allen*, 720 F. App'x 254, 257 (6th Cir. 2018) (citing *Minnesota v. Oleson*, 495 U.S. 91, 96-97 (1990)). Our appellate court affords broad Fourth Amendment protections to "nearly all overnight guests, clarifying that these Fourth Amendment protections extend to those who occupy common areas in an apartment that are freely accessible to others." *Id.* In the instant case, the record contains only Defendant Cozart's bare assertion that he was an overnight guest at 7900 Dry Valley Road, which was owned by the Loudon County District Attorney and rented by an individual named Chris Darnell. Defendant provided no explanation of his relationship to Mr. Darnell. On the video from Investigator Huskin's body camera, Defendant told the officers that he fell asleep in the SUV while waiting on Chris Darnell to return. Ms. Kress told Investigator Huskin that Chris Darnell had just left the residence to go to work. The fact that Defendant was asleep in a car in the driveway and did not seek to enter the residence seems to belie his assertion that he was an overnight guest at the residence.

17

The Supreme Court has rejected the premise that anyone legitimately in the place searched may challenge the legality of the search. *Rakas*, 439 U.S. at 134; *Carter*, 525 U.S. at 90. "[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Id.* An individual who is "'casual transient visitor'" to another's residence cannot challenge an officer's warrantless entry. *United States v. McNeal*, 955 F.2d 1067, 1071-74 (6th Cir. 1992). In the instant case, the record is devoid of evidence that Defendant Cozart was anything more than a casual transient visitor to the residence. Defendant Cozart has failed to carry his burden of demonstrating he has a legitimate expectation of privacy in 7900 Dry Valley Road. As such, the Court finds that he cannot challenge law enforcement's warrantless entry onto the property.

*(2) Entry onto Driveway*

In the event the District Judge disagrees with the undersigned's finding that Defendant Cozart lacks a reasonable expectation of privacy in the residence, the Court examines whether law enforcement properly entered the driveway of the residence without a search warrant to arrest Ms. Kress. For purposes of this analysis, the Court will assume Defendant Cozart was an overnight guest at the residence. Relying on *Collins v. Virginia*, 138 S. Ct. 1663, 1675 (2018), Defendant contends that officers could not enter the property and search the SUV without a search warrant. The Government responds that the officers' entry onto the driveway and approach of the residence was a consensual encounter requiring neither a search warrant, nor any level of suspicion. Alternatively, the Government argues that officers could enter the property to execute a valid arrest warrant for Ms. Kress, because they reasonably believed she was present at the residence.

In *Collins v. Virginia*, the Supreme Court examined the intersection of two well-settled Fourth Amendment principles, the automobile exception to the warrant requirement and the Fourth

18

Amendment's protection of the curtilage of a home. *Id.* at 1669. In *Collins*, an officer parked on the street, observed a motorcycle, which he suspected was stolen, covered by a tarp and parked in the driveway of the house where defendant was a frequent overnight guest. *Id.* at 1668. The officer walked to the top of the driveway, removed the tarp, and confirmed the motorcycle was stolen by checking the license plate and vehicle identification numbers. *Id.* After photographing the motorcycle and replacing the tarp, the officer returned to his car to wait for defendant. *Id.* When defendant returned home, the officer knocked on the front door, which was answered by defendant, who agreed to talk to the officer, admitted he bought the motorcycle without a title, and was arrested. *Id.* at 1668-69. The state supreme court held the warrantless search of the motorcycle was constitutional under the automobile exception,[5] because the officer had probable cause to believe the motorcycle was stolen. *Id.* at 1669. The Supreme Court reversed, holding that the automobile exception did not justify the warrantless entry onto the curtilage of defendant's home. *Id.* at 1671-73.

At the heart of the Fourth Amendment is the individual's right to be free of governmental intrusion in his or her home. *Id.* at 1663. This freedom extends also to the curtilage, which is the "area 'immediately surrounding and associated with the home'" and is considered to be "'part of the home itself for Fourth Amendment purposes.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). "When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth

---

[5] The automobile exception permits the warrantless seizure and search of an automobile based upon probable cause that it contains contraband, due to the vehicle's easy mobility, as well as its pervasive regulation, which diminishes the expectation of privacy. *California v. Carney*, 471 U.S. 386, 390-92 (1985). The automobile exception also applies if law enforcement has probable cause to believe the vehicle contains evidence of a crime. *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011).

Amendment has occurred." *Collins*, 138 S. Ct. at 1670. Such an intrusion "is presumptively unreasonable absent a warrant." *Id.* In *Collins*, the Supreme Court held that the automobile exception, which justifies only the search of the vehicle, did not justify the entry onto defendant's curtilage. *Id.* at 1671-72.

> Just as an officer must have a lawful right of access to any contraband he discovers in plain view in order to seize it without a warrant, and just as an officer must have a lawful right of access [i.e., an arrest warrant,] in order to arrest a person in his home, so, too, an officer must have a lawful right of access to a vehicle in order to search it pursuant to the automobile exception. The automobile exception does not afford the necessary lawful right of access to search a vehicle parked within a home or its curtilage because it does not justify an intrusion on a person's separate and substantial Fourth Amendment interest in his home and curtilage.

*Id.* at 1672.

Defendant argues that Investigator Huskin's actions of leaving the road and entering the curtilage of the residence in order to search the SUV violated his rights under the Fourth Amendment. The Government points out that the instant facts differ from those in *Collins* in two essential ways: Investigator Huskin intended to knock on the door of the residence, not search a car, and Investigator Huskin had a capias, i.e., an arrest warrant, authorizing his entry onto the curtilage. The Court finds Investigator Huskin's entry onto the driveway to execute a capias distinguishes this case from *Collins*.

An officer may enter onto private property by the path accessible to the public and initiate a consensual encounter, called a "knock and talk," without running afoul of the Fourth Amendment. *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005), *cert. denied*, 549 U.S. 819 (2006). "When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do[,]" and the resident, in turn, is not obligated to open the door or talk to the officer. *Kentucky v. King*, 563 U.S. 452, 469 (2011). "[T]he officers'

20

right to enter the property like any other visitor comes with the same limits of that 'traditional invitation': 'typically ... approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.'" *Morgan v. Fairfield County*, 903 F.3d 553, 563 (6th Cir. 2018) (quoting *Jardines*, 569 U.S. at 8), *cert. denied*, 139 S. Ct. 1377 (2019).

In the instant case, Investigator Huskin drove on and walked on the driveway, like any visitor to the property might do. He did not detour from the driveway but, instead, encountered Defendant and Ms. Kress in the SUV on the driveway after parking behind the SUV. Thus, the Court finds that Investigator Huskin did not violate the Fourth Amendment by entering the driveway of 7900 Dry Valley Road, where he encountered Defendant and Ms. Kress.[6]

As a closely related point, Investigator Huskin entered the driveway to execute the capias, not to search the SUV. As quoted above, *Collins* holds an officer engages in a search under the Fourth Amendment, when the officer "physically intrudes on the curtilage *to gather evidence*[.]" 138 S. Ct. at 1670 (emphasis added). "The officer must engage in some sort of investigation to implicate the Fourth Amendment's protections." *Morgan*, 903 F.3d at 573 (J. Thapar, concurring in part and dissenting in part). When the officer in *Collins* entered the driveway[7] to investigate

---

[6] In so finding, the Court does not rely on Investigator Huskin's testimony that it was his intent to knock on the door. Our appellate court rejected the argument that officers entry into the back yard during a knock and talk was not a search, because the officers did not intend to conduct a search: "The subjective intent of officers is irrelevant if a search is otherwise objectively reasonable, but subjective intent cannot make reasonable an otherwise unreasonable intrusion onto a constitutionally protected area." *Morgan*, 903 F.3d at 563. Investigator Huskin's entry onto the driveway to execute the capias was objectively reasonable without regard to his intent to merely approach the door, knock, and leave, if the occupants denied Ms. Kress was present.

[7] In *Collins*, the motorcycle was parked in the top of the driveway in an area that was partially enclosed by a low brick wall on two sides and the house on the third side and was covered by a tarp. 138 S. Ct. at 1671. "A visitor endeavoring to reach the front door of the house would have to walk partway up the driveway, but would turn off before entering the enclosure and instead proceed up a set of steps leading to the front porch." *Id*. In the instant case, the SUV was parked

whether the motorcycle under the tarp was the stolen motorcycle, he violated the Fourth Amendment. 138 S. Ct. at 1671. When the officer in *Collins* entered the driveway a second time to knock on the door and to talk to the defendant, he did not. In the instant case, the Court finds that Investigator Huskin did not enter the property in order to search the SUV, as Defendant alleges, but instead entered to execute the capias.

The Government also argues that Investigator Huskin lawfully entered onto the property to execute the capias for Ms. Kress, whom law enforcement reasonably believed would be at the residence. The Government argues that an officer armed with an arrest warrant does not have to stop at the threshold, as with a knock and talk, but may enter the residence itself to look for the subject of the arrest warrant. As noted above, in *Payton v. New York*, the Supreme Court determined that a valid arrest warrant authorizes law enforcement to enter and arrest a person in his or her own home. 445 U.S. 573, 603 (1980). "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* However, the authority to enter a residence with an arrest warrant is limited to the home of the person to be arrested. *Steagald v. United States*, 451 U.S. 204, 221 (1981) (observing that pursuant to *Payton*, "an arrest warrant alone will suffice to enter a suspect's own residence to effect his arrest").

In *Steagald*, police received a tip from an informant that Lyons, an individual with an outstanding arrest warrant, would be reached at an Atlanta residence over the next twenty-four hours. *Id.* at 1644. Police entered and searched the house, which belonged to Steagald and his

---

at the top of the driveway but was not parked in an enclosed section or in the area closest to the house. Additionally, the Court observes that Investigator Huskin had to drive and then walk on the driveway to get to the steps, the front porch, and the door of the residence.

wife.  *Id.* at 1645.  The officers did not find Lyons but saw cocaine in plain view.  *Id.*  Steagald

was prosecuted for the cocaine found in his residence, during law enforcement's search of the

property for Lyons.  *Id.*  The Supreme Court held that while an arrest warrant was sufficient to

protect the interests of the arrestee Lyons, either in public or in his home, it did not protect the

privacy interest of the third-party homeowner.  *Id.* at 1648.

> To be sure, the warrant embodied a judicial finding that there was
> probable cause to believe the Ricky Lyons had committed a felony,
> and the warrant therefore authorized the officers to seize Lyons.
> However, the agents sought to do more than use the warrant to arrest
> Lyons in a public place or in his home; instead, they relied on the
> warrant as legal authority to enter the home of a third person based
> on their belief that Ricky Lyons might be a guest there. Regardless
> of how reasonable this belief might have been, it was never
> subjected to the detached scrutiny of a judicial officer. Thus, while
> the warrant in this case may have protected Lyons from an
> unreasonable seizure, it did absolutely nothing to protect petitioner's
> privacy interest in being free from an unreasonable invasion and
> search of his home.

*Id.*  Thus, the Court held that a search warrant is necessary for an officer to enter the home of a

third-party to search for a non-resident with an arrest warrant, unless exigent circumstances are

present.  *Id.*

Defendant denies the capias for Ms. Kress authorized Investigator Huskin to enter onto the

property, arguing that a capias is not an arrest warrant and that the informant's tip did not provide

a reasonable basis to believe Ms. Kress was at 7900 Dry Valley Road.  The Defendant's first

argument, that a capias is not an arrest warrant, can be dispatched quickly.  "Capias" is "the general

name for several species of writs, the common characteristic of which is that they require the

officer to take the body of the defendant into custody; they are writs of attachment or arrest."

*Black's Law Dictionary* (4th ed. 1968).  The Tennessee Rules of Criminal Procedure require the

clerk of court to issue a capias for the charged person, after a grand jury returns an indictment.

Tenn. R. Crim. P. 9(a) [Exh. 7]. The capias shall "be in the same form as an arrest warrant;" "be signed by the clerk;" "describe the offense charged;" and "command that the defendant be arrested and brought before the court in which the charge is pending." Tenn. R. Crim. P. 9(b)(1)(A)-(D) [Exh. 7]. Like an arrest warrant, a capias shall be executed by an authorized officer by "arresting the defendant." Tenn. R. Crim. P. 4(e)(1) & -(3) & 9(d)(1) [Exh. 7]. The arresting officer does not have to have the capias in hand at the time of arrest but must show it to the arrestee upon request as soon as the officer can do so. Tenn. R. Crim. P. 4(e)(3) & 9(d)(1) [Exh. 7]. Both Investigator Huskin and Investigator Stanley testified that a capias is the same as an arrest warrant. The Court finds that a capias authorizes an arrest based on the grand jury's finding of probable cause to believe the defendant committed the crime. As such, a capias is the equivalent of an arrest warrant.

Defendant also contends that the officers lacked a reasonable belief that Ms. Kress would be at 7900 Dry Valley Road based on the tip from the confidential informant. He argues that nothing is known about the informant's basis of knowledge or when the informant knew Ms. Kress to be at the residence. The Court finds that the informant's tip had an even more basic flaw. It did not establish that Ms. Kress was a resident or was staying at 7900 Dry Valley Road.

"[A]n arrest warrant is sufficient to enter a residence if the officers, by looking at common sense factors and evaluating the totality of the circumstances, establish a reasonable belief that the subject of the arrest warrant is within the residence at that time." *United States v. Pruitt*, 458 F.3d 477, 483 (6th Cir. 2006), *cert. denied*, 549 U.S. 1283 (2007). The reasonable belief standard has "two components": A reasonable belief that the subject of the arrest warrant lives at the residence and a reasonable belief that the subject is inside the residence at the time the officers enter it. *El*

24

*Bey v. Roop*, 530 F.3d 407, 416 (6th Cir. 2008). "Reasonable belief is established by looking at common sense factors and evaluating the totality of the circumstances." *Pruitt*, 458 F.3d at 482.

In this case, Investigator Stanley testified that an agent from the Ninth Judicial Task Force reported a call from a confidential informant, who said Ms. Kress was at a rental property owned by the district attorney. The informant knew there was an arrest warrant for Ms. Kress, because the informant had made controlled purchases of illegal drugs from her. Investigator Stanley stated that law enforcement had used this informant multiple times in the past, and the informant had proven to be reliable. According to Investigator Stanley, law enforcement obtained multiple search warrants and arrests based on the information from that informant. Investigator Stanley said the informant reported that Ms. Kress was at the residence at the time of the phone call. The Court finds that the tip from the informant did not provide the officers a reasonable basis to believe Ms. Kress was a resident of 7900 Dry Valley Road, particularly when they knew that residence was owned by the Loudon County District Attorney. Thus, the capias for Ms. Kress did not give the officers authority to enter the house. *Steagald*, 451 U.S. at 221.[8]

---

[8] Relying on *United States v. Hardin*, 539 F.3d 404, 421-24 (6th Cir. 2008), Defendant argues that the informant's tip was insufficient to provide a reasonable believe that Ms. Kress was even at the property. In *Hardin*, the informant told officers that if defendant was the area, he would be staying at a certain apartment with an unidentified woman and driving a tan, four-door sedan. *Id.* at 422. The court found this information to be insufficient, emphasizing it contained no recent information from a firsthand source. *Id.* at 421.

While the Court acknowledges the information from the instant informant is not overwhelming, the Court finds it exceeds that provided by the informant in *Hardin* in both quality and recency. First, in contrast with the informant in *Hardin*, who was new to the arresting officer and provided accurate information in one other case, the instant informant's reliability is well established. The informant had previously provided accurate information in multiple cases leading to search warrants and arrests. Investigator Stanley corroborated that the residence named by the informant was owned by the District Attorney. He also could corroborate there was a capias for Ms. Kress based on distribution of methamphetamine. Finally, and importantly, the information was recent. The informant said Ms. Kress was currently at the residence at the time of the call. The Court finds the information from the confidential informant was both reliable and sufficient to provide a reasonable belief that Ms. Kress would be found at the residence. However, as discussed above, it did not provide a reasonable belief that she lived there or was staying there.

25

However, the Court finds the inadequacy of the informant's tip does not undermine the officer's authority to enter *onto the property*, because the officers never entered the residence. "[T]he caselaw makes clear that the reasonable-belief requirement is triggered only at the point when the police actually enter the home. Police officers are not precluded from knocking on the door of a residence in an effort to gather information supporting a reasonable belief that the suspect is inside." *El Bey*, 530 F.3d at 417. In assessing whether officers had a reasonable belief that the subject of an arrest warrant was at the house, the court observed that the officers did not "barge into the house" but, instead, conducted a knock and talk, "which they are entitled to do." *United States v. Taylor*, 666 F.3d 406, 409 (6th Cir. 2012). Here, law enforcement did not enter the residence at 7900 Dry Valley Road but, instead, used the tip on Ms. Kress's location to enter the driveway, an area by which the public may access the residence.

For the reasons outlined above, the Court finds that law enforcement did not need a search warrant to enter the driveway of 7900 Dry Valley Road in order to arrest Ms. Kress on a capias.

**B. Warrantless Seizure of Firearms**

Defendant's arguments focus on whether law enforcement violated the Fourth Amendment by entering the property. He contends that because law enforcement's entry onto the property was unconstitutional, neither the plain view exception, nor the automobile exception permit the search of the SUV and seizure of the two firearms. However, as discussed at length above, the Court finds that the officers lawfully entered the property to conduct a knock and talk to inquire about the presence of Ms. Kress, for whom they had a valid capias. When Deputy Huskin got out of his patrol car, which was parked in the driveway, and began walking on the driveway, he saw Defendant and Ms. Kress in the SUV on the driveway. Thus, the Court briefly examines whether

26

law enforcement could properly seize the firearms pursuant to the plain view exception to the warrant requirement.

In order for evidence to fall within the plain view exception, the evidence in question must be "(1) in plain view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place from where the object can be seen; and (4) seized by an officer who has a lawful right of access to the object itself." *United States v. Roark*, 36 F.3d 14, 18 (6th Cir. 1994) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)). In the instant case, the Court finds that Deputy Huskin saw a long gun on the console of the SUV, when he came to the open window of the vehicle, while lawfully on the driveway to conduct a knock and talk at the residence. Approximately ten minutes later, Investigator Stanley saw the firearm on the console and a second firearm on the backseat of the SUV, both observed through the windows of the SUV, while Investigator Stanley was on the property processing the arrest of Ms. Kress. The Court finds the first and third requirements are met. The Court examines whether the firearms were of a character that is immediately incriminating and whether the officers could lawfully seize the firearms from the vehicle.

"[T]he 'plain view' doctrine requires that the criminality of the articles before the officers be 'immediately apparent.'" *United States v. McLevain*, 310 F.3d 434, 440 (6th Cir. 2002) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)). Determining whether an item is immediately incriminating "does not demand an 'unduly high degree of certainty;' rather, a plain view seizure is 'presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.'" *United States v. Calloway*, 116 F.3d 1129, 1133 (6th Cir.) (quoting *Texas v. Brown*, 460 U.S. 730, 741-42 (1983) & *Payton*, 445 U.S. at 587 (emphasis omitted)), *cert. denied,* 522 U.S. 925 (1997). In assessing whether the incriminating character of

an item was immediately apparent, the Court is guided by the presence of any of the following three factors:

> (1) a nexus between the seized object and the [suspected criminal activity]; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to believe that it is associated with criminal activity; and (3) whether the executing officers can at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature.

*United State v. Pacheco*, 841 F.3d 384, 395 (6th Cir. 2019) (quotation omitted, additions in original). No one of these three factors is required but, instead, any of the three may inform the Court's analysis. *Id.*

In this case, the third factor, that the officer knew the item was contraband based on the facts available at that time, reveals that the incriminating nature of the firearms was immediately apparent to the officers. Deputy Huskin did not immediately recognize the firearm on the console was contraband, although he testified that he suspected Defendant could be a felon because Defendant was in jail for most of the time that Deputy Huskin previously worked there as a guard. Deputy Huskin properly ordered Defendant out of the car for officer safety, while he identified and arrested Ms. Kress. *See Cherrington v. Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003) (observing that "the police have the limited authority to briefly detain those on the scene, even wholly innocent bystanders, as they execute a search or arrest warrant"); *see generally Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (holding that during a traffic stop, an officer may order both the driver and the passengers to get out of the car). However, Investigator Stanley testified that at the time he encountered Defendant at the residence, he knew Defendant was a felon and that Defendant had been convicted of felony drug charges. Thus, the Court finds that at the time Investigator Stanley saw the firearms in the SUV, he knew the firearms were contraband, because he knew Defendant

was a felon and Deputy Huskin told him that Defendant had been seated in the driver's side of the SUV.

Finally, the firearms must have been seized by an officer with a lawful right of access to them. *See Roark*, 36 F.3d at 18. Defendant argues that even if the officers could properly arrest Ms. Kress based upon the capias, they could not seize the firearms for use against him. Relying on *Steagald*, 451 U.S. at 216-17, Defendant contends that law enforcement needed a search warrant, to search the SUV and seize the guns. The undersigned disagrees.

As discussed above, Deputy Huskin properly entered the property to inquire whether Ms. Kress, the subject of a capias, was present. While in the driveway, he observed Defendant and a woman, whom he identified as Ms. Kress, in a parked SUV. Deputy Huskin properly arrested Ms. Kress on the capias. Investigator Stanley arrived at the residence to back up Deputy Huskin. At this point, Ms. Kress was already in custody. Deputy Huskin and Investigator Stanley approached Defendant, who was walking his dog at top of the driveway just beyond the SUV, to ask for consent to search the SUV. At this time, Investigator Stanley looked into the car and saw the gun on the console. The officers were properly on the property, first to conduct a knock and talk and second to arrest Ms. Kress. *See United States v. Vaughn*, 429 F. Supp. 3d 499, 508-09 (E.D. Tenn. 2019) (Collier, J.) (finding that officers had probable cause to enter apartment after smelling marijuana when door was opened during knock and talk). "[I]f an officer is not searching for evidence against the accused, but inadvertently comes across incriminating objects, the plain view doctrine can be applied." *Mallory v. City of Riverside*, 35 F. Supp. 3d 910, 933 (S.D. Ohio 2014) (citing *Horton*, 496 U.S. at 135) (determining injured chickens were in plain view, when officers knock on the garage door cause it to open and, thus, "the officers came across the animals from a lawful vantage point"). The Court finds the officers had a lawful right of access to the firearms, which were in the SUV on the driveway.

29

Our appellate Court has recently upheld the use of the plain view doctrine to seize a firearm and controlled substances in a case in which the officer first entered onto the property to conduct a knock and talk. *United States v. Baker*, 976 F.3d 635, 642 (6th Cir. 2020), *cert. denied,* 141 S. Ct. 1750 (2021). In *Baker*, the officer conducted a knock and talk in an attempt to locate an individual with an arrest warrant. *Id.* A man answered the door, consented to the officer's entry, and stated he was Baker, which was the name of the subject of the arrest warrant. *Id.* at 643. The officer requested identification, to confirm the man's identity. *Id.* When the man left the room, the officer followed him and saw a rifle and marijuana in a back room. *Id.* at 644. The court held that the officer properly followed the suspect to maintain control over a person being arrested and, thus, the plain view exception applied to the seizure of the gun and drugs. *Id.*

In the instant case, Investigator Stanley was on the property to assist with the arrest of Ms. Kress. To be sure, this case differs from *Baker* in that Defendant (again assuming he was an overnight guest) did not consent to the officers' entry onto the property. However, the Court finds the underlying basis for the officers' observation of the firearms in the SUV—their presence in the driveway to arrest Ms. Kress—like the need to monitor the arrestee in *Baker*, provided the occasion for Investigator Stanley to observe the guns in the vehicle. Thus, the Court finds that Investigator Stanley lawfully had a right of access to the firearms in the SUV.

The Court finds the officers could lawfully seize the firearms from the SUV pursuant to the plain view exception to the warrant requirement.

V.    **CONCLUSION**

After carefully considering the parties' filings and arguments, the evidence, and the relevant legal authorities, the Court finds Defendant Cozart lacks a legitimate expectation of privacy in the residence at 7900 Dry Valley Road and, thus, cannot contest law enforcement's entry onto the property. Additionally, the Court finds that Investigator Huskin encountered

Defendant while lawfully on the driveway of the property. Finally, the Court finds that the officers

properly seized the firearms, which were in plain view. Accordingly, the undersigned respectfully

**RECOMMENDS** that Defendant's Motion to Suppress [**Doc. 36-1**] be denied.[9]

Respectfully submitted,

*Bruce Guyton*

United States Magistrate Judge

---

[9] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).